WOODWORTH *v.* PORTER.

1. SPECIFIC PERFORMANCE—ORAL CONTRACT FOR LAND—EVIDENCE—SUFFICIENCY.

In a suit against the heirs of the owner of a farm for the specific performance of an oral contract whereby the owner agreed with plaintiff that if he would continue to work the farm, improve it, and care for the owner and his wife, at their death the farm should go to him, evidence *held*, sufficient to establish the contract as claimed, and that plaintiff had discharged his obligations thereunder.

On specific performance of oral contract to leave property in consideration of services or support, see note in 44 L. R. A. (N. S.) 733.

2. SAME—PERFORMANCE—ADEQUACY OF CONSIDERATION.
  In said suit, where the record shows that the owner of the
    farm was satisfied with the way plaintiff performed his
    obligations under his contract, the heirs of the owner
    must be content also, and they may not question the
    adequacy of the consideration.

3. SAME—PROOFS—SUFFICIENCY.
  The legal requisites for decreeing performance of an oral
    contract, *held*, met by the proofs.

Appeal from Kent; McDonald (John S.), J. Submitted June 15, 1923. (Docket No. 15.) Decided October 1, 1923.

Bill by Irving Woodworth against Benjamin C. Porter, executor of the last will of Abby R. Burnham, deceased, and others, for the specific performance of a land contract. From a decree for plaintiff, defendants appeal. Affirmed.

*Charles E. Ward,* for plaintiff.

*John D. Ellis* and *Roger I. Wykes,* for defendants.

BIRD, J. This proceeding was begun to specifically enforce a farm land contract claimed to have been executed in the year 1890. Before hearing, the case was in this court on a motion to dismiss on the claimed insufficiency of the bill of complaint. The objections raised therein were overruled (213 Mich. 341). The case presented by plaintiff in his bill, in substance, is that in 1883 Ira Y. Burnham and his wife Abby lived on a tract of land in Georgetown township, Ottawa county, about 18 miles from Grand Rapids, consisting of several hundred acres. Only a small part of this was cleared and fit for cultivation. Most of it was low, wet and boggy. Except a small portion, it was covered with timber or underbrush. At that time Mr. Burnham had little property aside from this

farm.    Burnham was not a practical farmer and he
and his wife had reached the age when it was difficult
for them to engage in hard work.    In 1883 Burnham
had met plaintiff, who was principally engaged in
farming and who was much younger than himself,
and he liked him.    He leased the farm in George-
town township to plaintiff in the year 1883 for
a consideration of $250.    The principal use to
which the land could be put at that time was
pasture and the raising of hay.    Plaintiff continued
to lease the farm up to the year 1890 for a varying
yearly consideration.    In the year 1890 plaintiff con-
cluded, and informed Burnham, there was not sufficient
profit in the lease for him to continue it.    Burnham
appeared to be disappointed.    He had no children,
and he and his wife had become very much attached
to plaintiff by reason of his courteous treatment, and
wanted him to continue to operate the farm.    Mr.
Burnham was so much concerned about it that he in-
voked the aid of mutual friends to induce plaintiff to
remain on the farm.    Finally Burnham said to
plaintiff if he would continue to operate the farm, im-
prove it, and furnish him and his wife a yearly con-
sideration, or what they needed, and look after them
in their old age, the farm would be his after he and
his wife were through with it.    This proposition was
finally accepted by plaintiff, and he has had possession
of the farm ever since.    Soon after this arrangement
was made Mr. Burnham and his wife moved to the
city of Grand Rapids, and resided there until they
passed away.    After going into possession of the farm
under this arrangement, the plaintiff improved it by
clearing portions of it of timber and underbrush, ditch-
ing it, building fences and repairing old buildings and
building new ones.    Each year he paid Burnham vary-
ing sums ranging from $400 to $650 for the use of
the farm, and, in addition to this, he furnished Burn-

ham and his wife produce off from the farm, and extended to them the courtesies that an own son might extend to them, in taking them from place to place on business and pleasure, and looking after them when they were ill. When Mr. Burnham died, in 1908, he took charge of the funeral arrangements. After Mr. Burnham died plaintiff continued to look after Mrs. Burnham. When she wanted to go any place she called on plaintiff and he made the arrangements for her to go. On one occasion she fell ill while visiting in Illinois. It was her wish that plaintiff should come and bring her home, and he did so. Plaintiff continued to look after Mrs. Burnham until 1918, when she died, at the age of 87. When she died plaintiff took charge of the funeral arrangements.

Before Mr. Burnham died he transferred all of his property, including the farm, to Mrs. Burnham. Before Mrs. Burnham died she made a will in which she gave some of her relatives small legacies and the proceeds of a sale of the farm to the heirs of Mr. Burnham, who resided in the State of Illinois. They are the defendants herein. After plaintiff learned that Mrs. Burnham had disposed of the farm to others he filed this bill to have his contract enforced. After the hearing, at which a very large amount of testimony was taken, the chancellor decreed the title to the farm to be in plaintiff and confirmed his right to certain personal property delivered to him by Mrs. Burnham. From this decree the defendants appeal.

1. The testimony is very voluminous and will not be discussed in detail. From reading the testimony we are persuaded that the decree giving plaintiff the title to the 330 acres remaining in the farm and the moneys and evidences of indebtedness given to him by Mrs. Burnham before her death was no more than he was entitled to under his contract. That he had an oral contract with Mr. Burnham concerning the farm

there can be little question.   Numerous witnesses testified to conversations with Mr. Burnham during the period between 1890 and 1908, showing conclusively that the contract was as plaintiff claims, that the farm was to belong to him after the death of Mr. Burnham and wife.   It is not usual for such contracts to be made out as clearly and convincingly as this contract has been.   We are also satisfied that when the contract was made the farm constituted a very large part of Mr. Burnham's fortune, and he was relying on that property in the main to care for himself and wife during their declining years.   During the years following the contract, the land advanced in value due, in part, doubtless, to general market conditions and partly by reason of the improvements made thereon by himself and plaintiff.   The sale of some of the original farm, under an arrangement with plaintiff, and other lands, brought him considerable money and, doubtless, accounts for the moneys which he possessed in his later years.   The contract which plaintiff asserts is made more reasonable and probable because of the fact that Mr. Burnham had no children and, as he stated to several witnesses, he was under no obligations to his relatives; they had done nothing for him.

2. We are further satisfied that plaintiff discharged his obligations under the contract.   The testimony shows that he operated the farm as though it were his own.   He cleared portions of it of timber and underbrush, ditched it and got it under cultivation.   He repaired the buildings and built new ones.   He paid Burnham varying sums for its use from year to year, furnished them with produce and carried them edibles including cooked food.   Mr. and Mrs. Burnham stayed with plaintiff on the farm at times and one winter, while plaintiff was acting as sheriff of Kent county, they lived with him at the jail.   Plaintiff

looked after their comfort and carried them about with his carriage and automobile.    When Mr. Burnham died in 1908, and when Mrs. Burnham died in 1918, plaintiff took charge of the funeral arrangements in the same way he would have done had he been a son. They looked upon plaintiff the same as a son, and he cared for and looked after them in their declining years as a dutiful son would.

3. Much space has been devoted in the briefs arguing the question of inadequacy of consideration, and it is asserted by counsel that what plaintiff received, aside from the farm, more than paid him for what he did for the Burnhams.    It was not necessary that the consideration should be adequate.    When the contract was made the Burnhams were over on the western slope of life.    They wanted someone to look after and care for them in their old age.    They had no children to do this, so they naturally turned to a stranger. After renting the farm for seven years Mr. Burnham became very much attached to plaintiff and did not want him to leave.    He succeeded in getting him to remain, and for nearly 20 years thereafter relied on him as a father would a son.    The record is filled with nice things Mr. Burnham said to other people concerning Irv., as he called him, and a very significant thing is that no word of complaint or criticism is found in the record that Mr. Burnham ever uttered against plaintiff for a failure to discharge his obligation to him and his wife or to discharge his obligation toward the farm.    If Mr. Burnham was satisfied with the manner in which plaintiff discharged his obligations under his contract, his heirs must be content also. After Mr. Burnham's death he continued to look after and serve Mrs. Burnham, and, with a single exception, I can remember of no complaint which appears in the evidence which she made.    After Mr. Burnham's death she released a mortgage on plaintiff's farm and

gave him other personal property. The kind of service which both received from plaintiff is what usually induces a man to accumulate property. If this service is rendered by a child the property accumulated usually goes to him. If the burden falls on a stranger it usually and equitably goes to him.

There is not much conflict over legal questions in the case, although counsel state the legal requisites for decreeing performance of oral contracts and argue that they are not met by the proofs. In this contention we must disagree with counsel. The facts shown which appeal to us bring the case within the following cases: *Twiss* v. *George,* 33 Mich. 253; *Welch* v. *Whelpley,* 62 Mich. 15; *Taft* v. *Taft,* 59 Mich. 185; *Taft* v. *Taft,* 73 Mich. 502; *Ruch* v. *Ruch,* 159 Mich. 231; *Root* v. *Snyder,* 161 Mich. 200; *Howe* v. *Benedict,* 176 Mich. 522; *Charlet* v. *Teakle,* 197 Mich. 426.

The case essentially turns on questions of fact. After a very thorough review of the evidence we have concluded to affirm the decree of the trial court, but it is done with the impression that if any injustice was done by the trial court in its decree it was not done to appellants.

The decree of the lower court will be affirmed, and plaintiff will recover his costs in this court.

WIEST, C. J., and CLARK, SHARPE, and MOORE, JJ., concurred. FELLOWS, McDONALD, and STEERE, JJ., did not sit.